UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| JEFFREY BARDO, *Plaintiff*, v. DR. CARSON WRIGHT, *individually*, Defendant. | Civil No. 3:17-cv-1430 (JBA) November 8, 2019 |
|---|---|

**RULING DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Jeffrey Bardo brings this civil rights action pursuant to 42 U.S.C. § 1983 against Defendant Carson Wright, a physician at the state prison where plaintiff was incarcerated. Mr. Bardo alleges that Dr. Wright violated his Eighth Amendment rights by acting with deliberate indifference toward his facial lesion, which was later diagnosed as basal cell carcinoma. Dr. Wright now moves for summary judgment [Doc. # 27]. For the reasons that follow, Defendant's Motion for Summary Judgment is denied.

### I. Background

Plaintiff Jeffrey Bardo is a former Connecticut state prisoner, who entered Connecticut Department of Correction ("DOC") custody on August 24, 2012 and was housed at a variety of DOC facilities during his imprisonment term. (Parties' L.R. Stmts. [Docs. ## 27-14, 28-1] ¶ 1.) Defendant Carson Wright is a physician who provided medical care to DOC inmates while Mr. Bardo was incarcerated at Carl Robinson Correctional Institution. (*Id.* ¶¶ 2-3.)

#### A. Mr. Bardo's Treatment Prior To Entering Dr. Wright's Care

On December 16, 2012, while incarcerated at the Willard Cybulski Correctional Institution, Mr. Bardo submitted a medical request stating that he had "an odd spot on [his] face that need[ed] to be checked out." (Ex. 3 (Medical Request Forms) to Pl.'s Opp. [Doc. # 28-4] at 2.)

Two days later, on December 18, 2012, Mr. Bardo saw a DOC physician, Dr. Michael Clements. (Parties' L.R. Stmts. ¶¶ 5, 6.) Dr. Clements documented the "spot" on Mr. Bardo's medical chart, describing it as a two-centimeter sebaceous cyst.[1] (*Id.* ¶ 6.) Dr. Clements also provided an illustration of the spot, sketching a face with a round circle on the right cheek just below the eye. (*Id.*) Dr. Clements made these observations without "measur[ing] the cyst . . . with a ruler," instead making a visual estimation.[2] (Ex. 3 (Clements Decl.) to Def.'s Mot. for Summ. J. [Doc. # 28-3] ¶ 3.) Dr. Clements "advised Bardo to watch for enlargement of the cyst and for progression of symptoms, such as pain or tenderness and changes in color, shape or size." (*Id.* ¶ 6.)

On June 18, 2013, while incarcerated at Osborn Correctional Institution, Mr. Bardo visited the medical unit regarding a "bump under the skin of his abdomen." (Parties' L.R. Stmts. ¶ 12.) The clinical record from that visit states that Mr. Bardo asked about an "old scar on his face" and said he did "not know how it got there" and that it would "not go away." (Ex. 4 (Clinical Records) to Def.'s Mot. for Summ. J. [Doc. # 27-4] at 242.)[3] Mr. Bardo visited Osborn's medical unit again on July 5 and 30, 2013, but clinical records from those visits do not reference the facial lesion. (*Id.*)

### B. Mr. Bardo's Treatment While in Care of Dr. Wright

On August 15, 2013, Mr. Bardo was transferred to Carl Robinson Correctional Institution, where Dr. Wright treated inmates. (Parties' L.R. Stmts. ¶¶ 1, 4.) On August 20, 2013, Mr. Bardo

---

[1] A sebaceous cyst is "closed sac that can be found under the skin anywhere on the body," which may appear as red or inflamed. (Parties' L.R. Stmts. ¶ 8.)

[2] Plaintiff disputes that Dr. Clements's two-centimeter measurement was necessarily accurate. (Parties' L.R. Stmts. ¶ 6.)

[3] Plaintiff disputes that this record "contains a precise account of what Mr. Bardo said regarding his facial lesion." (Parties' L.R. Stmts. ¶ 12.)

submitted a medical request stating, "I have a spot on my face and also a strange lump on my stomach and would like to have them both checked out." (Medical Request Forms at 3.) The next week, on August 28, he filed a nearly identical request regarding the "spot on [his] face." (*Id.* at 4.)

On August 31, 2013, Bardo was seen by Nurse Thaddeus Burgmeyer at the Robinson medical unit. (Parties' L.R. Stmts. ¶ 15.) In the clinical note for the visit, Nurse Burgmeyer "documented that Bardo explained that he had skin discoloration and a bump under his right eye" for "x years." (*Id.*) Nurse Burgmeyer described the "bump" as a "non-raised mass that was not crusty, had no drainage, was hard but not movable, was firm and had positive pigmentation that was the same as the skin color but more pink at its surrounding edges." (*Id.*) Nurse Burgmeyer also wrote a note indicating that a sick call should be "scheduled for further eval[uation]." (Clinical Records at 239.)

On November 20, 2013, Mr. Bardo saw Defendant Dr. Wright in the Robinson medical unit for the first time. (Parties' L.R. Stmts. ¶ 16.) As part of the visit, Dr. Wright had opportunity to review Mr. Bardo's clinical records—including the notes by Dr. Clements and Nurse Burgmeyer—as was his standard practice when treating a patient. (Ex. 5 (Wright Dep.) to Pl.'s Opp. [Doc. # 28-6] at 67, 71-72, 78.) During this visit, Dr. Wright observed Mr. Bardo's stomach lump and facial lesion. (Parties' L.R. Stmts. ¶ 15.) However, Dr. Wright did not touch the facial lesion for a physical examination. (Wright Dep. at 81.) In his notes, Dr. Wright drew a diagram depicting the facial lesion on the right cheek below the right eye. (Clinical Records at 239.) Mr. Bardo recalls that during this visit, he "expressed concern about the lesion on his face to Dr. Wright and asked if it could be skin cancer," to which "Dr. Wright responded that it was not." (Ex. 1 (Bardo Decl.) to Pl.'s Opp. [Doc. # 28-2] ¶ 2.)

3

On March 18, 2014, Mr. Bardo saw Nurse Linda Oeser at the Robinson medical unit for a variety of ailments. (Parties' L.R. Stmts. ¶ 27.) In her medical note, Nurse Oeser wrote "eval facial lesion (? biopsy)," (Clinical Records at 164), which the parties understand to mean that it was necessary to "schedule a medical doctor sick call to evaluate a facial lesion with an indication that the medical doctor, who would be [Defendant] Carson Wright, might consider a biopsy." (Parties' L.R. Stmts. ¶ 27.) She recorded that the "lesion had been present for 1-2 years," and she noted telangiectasia, which refers the presence of "dilated capillaries, which are prominent small blood vessels." (*Id.*)

The next week, on March 24, 2014, Mr. Bardo had his second and final appointment with Dr. Wright regarding the lesion. (*Id.* ¶ 28.) As part of the examination, Dr. Wright "recorded that that Bardo had a lesion on his face for 2-3 years" that was "indurated"—that is, firm and fibrous—but not tender or itchy. (*Id.*) In his note, Dr. Wright sketched Mr. Bardo's face and placed a circle on the right cheek. (Clinical Records at 233.) In shorthand, Dr. Wright wrote "rule out" tinea versicolor, a fungal infection. (Parties' L.R. Stmts. ¶ 28.) For treatment, Dr. Wright prescribed an antifungal cream, Lotrimin 1%, and a steroid cream, triamcinolone 0.1%, to be mixed in equal parts and applied to the lesion daily for 30 days. (*Id.*) Dr. Wright also noted that a medical doctor sick call for follow-up should be made in 30 days. (Clinical Records at 233.) These sick calls are typically scheduled by nurses. (Parties' L.R. Stmts. ¶ 33.) Of this visit, Mr. Bardo recalls that Dr. Wright told him that his lesion was likely ringworm. (Ex. 3 (Bardo Dep.) to Def.'s Reply [Doc. # 36-3] at 95.)

In a deposition, Dr. Wright explained that he diagnosed the lesion as tinea versicolor without conducting a differential diagnosis because that fungus was very common at Robinson. (Wright Dep. at 87-93.) A differential diagnosis involves identifying the possible medical outcomes

4

and then narrowing down options according to how the symptoms manifest. Dr. Wright acknowledged that it is standard practice for doctors to make differential diagnoses, but his "thought process told [him] it was tinea" and that "if you kind of know what it is, you can sort of follow suit." (*Id.* at 93, 96.) He also acknowledged that the prison medical unit did not perform biopsies, and that "there's a lot of steps" before a doctor can refer a patient to an outside specialist. (*Id.* at 97-98.) Specifically, Dr. Wright would have needed to fill out a form and make a referral request to a Utilization Review Committee ("URC"). (Ex. 2 (Wright Decl.) to Def.'s Reply [Doc. # 36-2] ¶¶ 3, 4.)

On March 31, 2014, Dr. Wright learned that Mr. Bardo had not received one of the topical creams that he had prescribed. (Wright Dep. at 11.) He entered a new physician's order that day, changing "the dose and duration of the triamcinolone (increasing it from once a day to twice a day and from 30 days to 60 days)." (Parties' L.R. Stmts. ¶ 34.) That order also shows a notation to "discontinue" the prior prescription for triamcinolone and Lotrimin. (Clinical Records at 163.) Dr. Wright avers that "Lotrimin" is not written in his handwriting and that he never discontinued the drug. (Wright Decl. ¶¶ 7, 10.) Dr. Wright has also declared that it is possible that he gave the Lotrimin directly to Mr. Bardo during the office visit. (*Id.* ¶ 13.) Mr. Bardo also recalls receiving a topical medication in person. (Bardo Dep. at 95.)

On April 27, 2014, Mr. Bardo submitted another request, stating that he "was recently put on some creme for a spot on my face" and it "is not working at all." (Medical Request Forms at 6.) The request asked, "Could we please try something else?" (*Id.*)

On April 28, 2014, Bardo was seen in the Robinson medical unit by Nurse Margo Griffin. (Parties' L.R. Stmts. ¶ 35.) She recorded that Mr. Bardo "told her that his facial 'rash' was still there and that the cream prescribed by Dr. Wright 'made it come out more.'" (*Id.*) She noted that "the

5

rash was red and round, was located below the right eye, and was flaking without drainage"—that is, "the skin [was] getting dry and scaly or that the skin [was] coming off like dandruff." (*Id.*) In his deposition, Dr. Wright testified that he took this information to mean that the cream he prescribed was having some effect. (Wright Dep. at 113.)

On May 5, 2014, Dr. Wright noted in his physician's orders that he discontinued the triamcinolone and had "entered a new order of Clobetasol 0.05%," another steroid cream, "to be applied twice a day for 3 months." (Clinical Records at 163.) Dr. Wright did not see Mr. Bardo prior to making this change, and instead altered the prescription based on Nurse Griffin's notes. (Wright Dep. at 113-14, 117-21.) On May 7, 2014, Mr. Bardo confirmed with Nurse Griffin that he received the Clobetasol. (Clinical Records at 262.)

In July 2014, Mr. Bardo sought a transfer to a halfway house. (Parties' L.R. Stmts. ¶ 41.) This required a reduction to his designated medical level, which DOC scores on a range from one to five. (*Id.*) On July 25, 2014 Dr. Wright adjusted Mr. Bardo's medical level from 3 to 2, without seeing the patient. (*Id.*)

On August 28, 2014, Mr. Bardo was transferred from Robinson to a halfway house. (*Id.* ¶ 42.) His medical transfer summary did not reference the facial lesion. (Clinical Records at 171.)

On November 24, 2014, while at the halfway house, Mr. Bardo made a request to see a non-DOC medical provider, and he offered to pay out of pocket. (Ex. A (Bardo Client Request) to Ex. 1 of Pl.'s Opp. [Doc. # 28-2] at 1.) Mr. Bardo's request mentioned "a few" medical issues that would "either take too long" through DOC or involve "treat[ment] by a moron." (*Id.*) The request was denied on the basis that "clients are not allowed to use outside [doctors]." (*Id.*)

6

Mr. Bardo reentered Robinson on January 29, 2015, and he remained there until July 27, 2015. (Parties' L.R. Stmts. ¶ 43.) He received some medical care during this period, but for ailments unrelated to the facial lesion. (*Id.* ¶¶ 44-46.)

On July 27, 2015, Mr. Bardo was again transferred to a halfway house. (*Id.* ¶ 47.) Again, his transfer summary did not mention the facial lesion. (Clinical Records at 218.) During this second stay at a halfway house, Mr. Bardo received some medical care from the New Haven Correctional Center. (*Id.* at 220-23.) Mr. Bardo has testified that he asked about the lesion during a September 25, 2015 visit, but was told to wait to see someone in the community upon his release. (Bardo Dep. at 128.)

### C. Diagnosis of Mr. Bardo's Facial Lesion as Basal Cell Carcinoma Upon Release

Mr. Bardo was released into the community on September 29, 2015. (Parties' L.R. Stmts. ¶ 1.) On December 7, 2015, Mr. Bardo was seen by a primary care physician, who observed a "quadrangle shaped lesion" on the right cheek with telangiectasia in the center and a "rolling edge appearance." (Ex. 6 (Primary Care Records) to Pl.'s Opp. [Doc. # 40] at 9.) The physician then referred Mr. Bardo to a dermatologist for a biopsy. (*Id.* at 13.)

On January 7, 2016, Mr. Bardo's facial lesion was diagnosed as basal cell carcinoma. (Parties' L.R. Stmts. ¶ 48.) The carcinoma was diagnosed as the "morpheaform" variant, which has a waxy scarlike appearance and poorly defined borders. (Ex. 7 (Whalen Records) to Def.'s Mot. for Summ. J. [Doc. # 26-2] at 2-3, 27.)

On February 4, 2016, Mr. Bardo underwent a pre-surgery evaluation with dermatologist Dr. James Whalen at UConn Medical Center. (*Id.* at 2.) Dr. Whalen measured the carcinoma and documented its appearance as a "2.5 x 2.7 cm pink plaque with indistinct margins." (*Id.* at 2.)

On February 16, 2016, Mr. Bardo had the cancerous cells removed by Mohs surgery, where tissue is excised in stages until no cancerous cells appear at the margins. (Parties' L.R. Stmts. ¶ 49.) Dr. Whalen began the surgery by making a 2.2 x 2.2 centimeter incision in an effort to minimize the amount of tissue removed. (Ex. 7 (Whalen Dep.) to Pl.'s Opp. [Doc. # 28-7] at 11-14, 36-39.) The final size of the open surgical wound was 3.9 x 4.0 centimeters. (*Id.* at 14.)

The wound was closed by a rotational flap repair, which involves the transfer of skin from one part of the body to the surgical wound site. (Parties' L.R. Stmts. ¶ 49.) In his deposition, Dr. Whalen stated that a rotational flap for a tumor with a narrower width likely would have been smaller. (Whalen Dep. at 53-54.) However, Dr. Whalen also noted that the tumor still "would have to be substantially smaller to avoid this kind of reconstruction." (*Id.* at 44.) He further stated that Mohs surgery is generally indicated for morpheaform basal carcinoma because the margins are hard to assess. (*Id.* at 46.) Dr. Whalen added that a linear closure—as opposed to a rotational flap— would be hard to perform once a tumor grows to 2 centimeters. (*Id.* at 47.)

### D. Expert Testimony Regarding the Lesion

Defendant Dr. Wright has disclosed one expert, dermatologist Dr. Daniel Siegel. When asked about the difference between tinea versicolor and basal cell carcinoma, Dr. Siegel testified that tinea versicolor rarely appears on a face and that Dr. Wright's assessment of the lesion was "obviously" a misdiagnosis. (Ex. 12 (Siegel Dep.) to Pl.'s Opp. [Doc. # 28-12] at 27, 29.) Dr. Siegel further testified that he has seen thousands of tinea versicolor cases, but never one on a person's face. (*Id.*) When asked to rate the level of Dr. Wright's malpractice on a scale of ten, Dr. Siegel stated that this would be a "seven, eight" from an "intellectual point," but a five on a "practical point" because carcinoma is "slow growing and not changing much." (*Id.* at 30.)

Plaintiff Mr. Bardo has disclosed Dr. Wayne Jay Altman, a family medicine physician, to testify as an expert. Dr. Altman's report concluded that Dr. Wright should have referred Mr. Bardo to a dermatologist after their first sick call on November 20, 2013. (Ex. 8 (Altman Report) to Pl.'s Opp. [Doc. # 28-8] at 2.) Dr. Altman wrote that by "failing to promptly diagnose and treat the basal cell carcinoma, Dr. Wright permitted the cancer to spread," which resulted in a "more intrusive surgery." (*Id.* at 3.) In his deposition, Dr. Altman testified that it is "quite unusual" for tinea versicolor to appear on the face, (Ex. 9 (Altman Dep.) to Pl.'s Opp. [Doc. # 32] at 31), and that it "contrasts greatly" from basal cell carcinoma, (*id.* at 36). He observed that basal cell carcinoma is "more likely to not be flat whereas tinea is mostly flat." (*Id.*) Dr. Altman suggested one of the few traits that the two conditions share is that both can appear red. (*Id.*) In his view, it was "obvious that [the lesion] was not tinea versicolor." (*Id.* at 112.) As to the proper standard of care, Dr. Altman commented that a doctor would show "disregard for a patient's well-being" by "avoid[ing] appropriate management . . . because it would be harder and there would be additional work involved." (*Id.* at 116.)

Mr. Bardo has also identified Dr. Steven Hubert, a dermatologist, as an expert. Dr. Hubert's report stated that tinea versicolor "is not in the differential diagnosis of a single lesion that is indurated and has telangiectasia because these features are not seen in tinea versicolor but are commonly found in basal cell cancer." (Ex. 10 (Hubert Report) to Pl.'s Opp. [Doc. # 28-10] at 3.) He also concluded that a linear closure of the surgery wound would have been possible if the basal cell carcinoma were caught early, "which is usually less disfiguring and painful." (*Id.*) Dr. Hubert made the same points in his deposition, stating that a rotational flap surgery would have been less likely and a smaller surgical defect would have been more likely if the basal cell carcinoma had been diagnosed earlier. (Ex. 11 (Hubert Dep.) to Pl.'s Opp. [Doc. # 28-11] at 98-99.)

## II. Discussion

### A. Summary Judgment Standard

Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted).

If a summary judgment motion is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the nonmovant must do more than "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted). The non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.*

In reviewing the record, the court must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in [his] favor." *Gary Friedrich Enters., L.L.C. v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (citation omitted). The court may not, however, "make credibility determinations or weigh the evidence . . . [because] [c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 607–08 (2d Cir. 2017) (internal quotation marks and citations omitted). If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the opposing party on

the issue on which summary judgment is sought, however, summary judgment is improper. *See Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

### B. The Eighth Amendment Deliberate Indifference Claim

Mr. Bardo alleges that "Dr. Wright repeatedly failed to refer Mr. Bardo to a dermatologist so he could obtain a biopsy," and so "was deliberately indifferent to his serious medical needs in violation of the Eight Amendment." (Pl.'s Mem. in Opp. [Doc. # 28] at 1.)[4]

"The Cruel and Unusual Punishments Clause of the Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). An official violates that duty when he acts with deliberate indifference toward a prisoner's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). To succeed on a deliberate indifference claim, a prisoner "must satisfy two requirements—one subjective and one objective." *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005).

First, the prisoner must establish that the alleged deprivation "is, in objective terms, 'sufficiently serious'—that is, the prisoner must prove that his medical need was 'a condition of urgency, one that may produce death, degeneration, or extreme pain.'" *Id.* (quoting *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir. 1998)). As with other cases in this circuit involving basal cell carcinoma, the parties here do not dispute that Mr. Bardo's condition—a cancerous growth that required surgical removal—was "sufficiently serious" to satisfy the objective element of this claim. *See, e.g., Stiehl v. Bailey*, No. 08-CV-10498 CS, 2012 WL 2334626, at *9 (S.D.N.Y. June 19, 2012)

---

[4] In his Complaint, Mr. Bardo also alleges that Dr. Wright was "deliberately indifferent in supervising and training subordinates." (Compl. [Doc. # 1] ¶ 25.) However, Mr. Bardo's counsel represented at oral argument that he is no longer pursuing this supervisory liability claim.

11

(no dispute that basal cell carcinoma "'serious' within the meaning of the Eighth Amendment"); *Sheils v. Flynn*, No. 9:06-CV-407, 2009 WL 2868215, at *15 (N.D.N.Y. Sept. 2, 2009) (same).

Second, the prisoner must prove, subjectively, that the prison official acted with a "sufficiently culpable state of mind." *Salahuddin*, 467 F.3d at 280. "In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Id.* As the Supreme Court explained in *Farmer v. Brennan*, deliberate indifference is equivalent to "criminal recklessness," where an individual "disregards a risk of harm of which he is aware." *Farmer*, 511 U.S. at 837. "The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices." *Salahuddin*, 467 F.3d at 280.

"The state of the defendant's knowledge is normally a question of fact to be determined after trial." *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996). "Although *Farmer* requires that a plaintiff prove actual knowledge of a risk, evidence that the risk was obvious or otherwise must have been known to a defendant is sufficient to permit a jury to conclude that the defendant was actually aware of it." *Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003) (citing *Farmer*, 511 U.S. at 842); *see also Hope v. Pelzer*, 536 U.S. 730, 738 (2002) ("We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious."); *Hudak v. Miller*, 28 F. Supp. 2d 827, 831 (S.D.N.Y. 1998) (Sotomayor, J.) ("[I]f the evidence shows that the risk of serious medical problems was so obvious that a reasonable factfinder could infer actual knowledge of them on [defendant's] part, this Court must deny summary judgment.") Deliberate indifference may also be inferred "where treatment was 'cursory' or evidenced 'apathy.'" *Hannah v. Chouhan*, No. 3:04-

12

CV-314 (JBA), 2005 WL 2042074, at *4 (D. Conn. Aug. 24, 2005) (quoting *Ruffin v. Deperio*, 97 F. Supp. 2d 346, 353 (W.D.N.Y. 2000)); *see also Hathaway v. Coughlin*, 37 F.3d 63, 67 (2d Cir. 1994) ("A jury could infer deliberate indifference from the fact that [defendant] knew the extent of [plaintiff's] pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [plaintiff's] situation.") Additionally, a factfinder may infer that a physician had actual knowledge of a risk and acted with deliberate indifference toward that risk "if he or she consciously chooses 'an easier and less efficacious' treatment plan." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) (quoting *Williams v. Vincent*, 508 F.2d 541, 544 (2d Cir.1974)).

Here, the record, taken in the light most favorable to Plaintiff, permits the inference that the risk of skin cancer was sufficiently obvious that Dr. Wright must have had actual awareness of it. All three experts, including Dr. Wright's own expert Dr. Siegel, offered the opinion that it would be "obvious" to a reasonable physician that Mr. Bardo's lesion was *not* tinea versicolor. (Siegel Dep. at 83 (agreeing that the "lesion was obviously not tinea versicolor"); Altman Dep. at 112 ("In this case, it was obvious that it was not tinea versicolor."); *see also* Hubert Report at 3 (stating that tinea versicolor would not even be considered for the purposes of a differential diagnosis of Mr. Bardo's lesion).) Expert Dr. Altman also concluded that "Dr. Wright should have referred Mr. Bardo to a dermatologist for a biopsy when he first saw the patient" in November 2013, because the lesion had been present since 2012 and "[i]t is reasonable to expect a primary care doctor [to] have acted promptly to try to rule out basal-cell carcinoma." (Altman Report at 2.)

Dr. Wright had also been alerted to the risk of skin cancer by Mr. Bardo and by Nurse Oeser. Mr. Bardo testified that he specifically asked if the lesion was skin cancer at his first appointment in November 2013, and Dr. Wright dismissed that possibility. (Bardo Decl. ¶ 2.)

Separately and subsequently, Nurse Oeser suggested a biopsy of the lesion in a note added before Dr. Wright's second appointment with Mr. Bardo in March 2014, (Clinical Records at 164)—a fact that should have caused Dr. Wright to "question[] the accuracy of his diagnoses" and consider "the possibility of a biopsy," according to Plaintiff's experts. (Hubert Report at 3; *see also* Altman Report at 3 (addressing Nurse Oeser's note and characterizing Dr. Wright's subsequent inaction on "moving forward in ruling out carcinoma" as "inexplicab[le]").) From this, a jury could reasonably infer that Dr. Wright had actual knowledge of the risk of skin cancer.

A jury could also find that Dr. Wright's treatment of Mr. Bardo was "cursory," and thus infer that Dr. Wright acted with deliberate indifference toward the patient's condition. Mr. Bardo's clinical records indicate that he saw Dr. Wright twice about the facial lesion, once on November 20, 2013 and once on March 24, 2014. By the time of the first visit, Mr. Bardo's clinical records contained three notes about the facial lesion, dating back to December 2012. At that first November 13 visit, Dr. Wright did not conduct a physical examination of the lesion, did not prescribe any course of treatment, and did not make any record in Mr. Bardo's chart about the need for a follow-up visit. At the second March 2014 visit, Dr. Wright took more action, but did not order a biopsy. Instead, he gave Mr. Bardo a 30-day course of medication and specifically made note of the need for a follow-up appointment. However, no follow-up visit was ever conducted,[5] even though Dr. Wright had at least three opportunities to review that note. On April 27, 2014, Mr. Bardo submitted a medical request stating that the creams were "not working at all," but no medical sick call was

---

[5] Dr. Wright has presented evidence that Robinson's nursing staff was responsible for scheduling medical appointments during the relevant timeframe. (Parties' L.R. Stmts. ¶ 31; *see also* Ex. 5 (Oeser Dep.) to Def.'s Mot. for Summ. J. [Doc., # 28-5] at 19.) However, Mr. Bardo disputes that this is the only way a doctor could ensure the scheduling of a follow-up appointment.

scheduled. (Medical Request Forms at 6.) On May 5, 2014, Dr. Wright revisited Mr. Bardo's records and entered a new prescription without addressing the prior note regarding the need for a follow-up visit with the patient. On July 25, 2014, Dr. Wright had another opportunity to address his note to follow up with Mr. Bardo when he revised the patient's designated medical level, but again Dr. Wright took no action.

Mr. Bardo has also offered evidence that would allow a jury to find that Dr. Wright "consciously cho[se] an easier and less efficacious treatment plan" for the lesion. *Chance*, 143 F.3d at 703 (internal quotation marks omitted.). At his deposition, Dr. Wright was asked whether a biopsy would be necessary to rule out basal cell carcinoma as a diagnosis. (Wright Dep. at 97.) Dr. Wright answered in the affirmative, but added, "But you see, the whole thing is there's a lot of steps before you do that." (*Id.*) He later added that there was a "little bit" of paperwork required to send a patient to a specialist and that the committee that reviews referrals would possibly scrutinize the decision to send Mr. Bardo to a specialist. (*Id.* at 99 ("[B]ut the question they['re] probably going to ask me is, Did I try these these other avenues before I -- I sent him there or I put the paperwork in?").) Although Dr. Wright subsequently submitted an affidavit stating that the "total time required to complete a URC [referral] request ranged from 3 to 4 minutes" and that he "never considered making a URC request to refer Plaintiff to a dermatologist because [he] was confident that his facial lesion was a fungal infection," (Wright Decl. ¶¶ 5, 6), it is the role of the jury to determine whether Dr. Wright is credible on these points.

Without directly rebutting Plaintiff's other arguments as to reasonable inferences that may be made as to Defendant's mental state, Dr. Wright contends that summary judgment is nonetheless appropriate because he made a "consistent effort" to address Mr. Bardo's medical needs in a "professional and humane manner." (Def.'s Mem. [Doc. # 27-13] at 18.) In addition to

15

prescribing medicine for the facial lesion, Dr. Wright also treated Mr. Bardo's complaints of an abdominal lump, a kidney stone, and folliculitis. (*Id.* at 17-18.) However, the "fact that the defendant[] responded to plaintiff's complaints and treated plaintiff's symptoms does not preclude a finding that the defendant[] w[as] deliberately indifferent to a serious medical need." *Hannah*, 2005 WL 2042074, at *4.

Dr. Wright also asserts that the record does not demonstrate that he was "actually aware of a substantial risk and was deliberately indifferent toward it," but rather that he "exercised his medical judgment and treated what he believed to be a fungal infection." (Def.'s Mem. at 18.) Dr. Wright contends that his adjustments to Mr. Bardo's prescriptions demonstrate that he was not acting with deliberate indifference, as he made an order for a "stronger corticosteroid" after learning that the original prescriptions caused the lesion to flake and "conclud[ing] that the treatment was working." (*Id.*) Although Dr. Wright concedes that the evidence here may well support a finding of negligence, he still maintains that the record lacks evidence that he had actual knowledge of the risk of basal cell carcinoma. He argues that the claim here is comparable to the one in *Sheils v. Flynn*, where the Northern District of New York granted summary judgment to nine prison officials who failed to immediately diagnose a prisoner's shoulder lesion as basal cell carcinoma because the record "does not indicate any behavior on Defendants' part that elevates the situation from possible medical malpractice to the level of a constitutional violation." *Sheils*, 2009 WL 2868215, at *18.

Notwithstanding Defendant's concession that his actions may have been negligent, reasonable jurors could conclude that he was sufficiently callous about Plaintiff's health in the face of actual awareness of Plaintiff's risk of untreated skin cancer as to support a finding of deliberate indifference. Unlike the plaintiff in *Sheils*, Mr. Bardo has presented expert testimony that Dr.

Wright made an "obvious" misdiagnosis and that Mr. Bardo should have received a prompt referral to a dermatologist for a biopsy. Dr. Wright's treatment of Mr. Bardo is also distinguishable from the treatment provided in *Sheils*. In *Sheils*, the plaintiff "received frequent medical care" for his skin condition and was "prescribed various medications in an attempt to relieve his symptoms." *Id.* at *18. Significantly, the *Sheils* plaintiff was ultimately sent to a dermatologist for a biopsy, which occurred seven months after the shoulder lesion was clearly documented in plaintiff's clinical records. *Id.* at *13; *see also Stiehl*, 2012 WL 2334626, at *9 (summary judgment granted where the record showed that "Plaintiff was seen by doctors or nurse practitioners regarding his [undiagnosed basal cell carcinoma] growth approximately sixteen times, and other practitioners discussed Plaintiff's case with each other, set up consultations with specialists, procured necessary tests, and scheduled Plaintiff for an excision biopsy" and where "medical providers were monitoring the size, shape, and color of the mass, as well as any medical issues relating to it").

In contrast to *Sheils*, the record here is insufficient to support a legal conclusion that Defendant acted with mere negligence in diagnosing tinea versicolor and persisting with that diagnosis against all medical indicators. Mr. Bardo has presented evidence that Dr. Wright knew the facial lesion had existed for two years, knew it was not resolving with Defendant's prescribed treatment, refused to order a biopsy to rule out skin cancer because of the effort involved, and failed to conduct a patient follow-up visit in the necessary timeframe or anytime thereafter. Thus, reasonable jurors could conclude that Dr. Wright's treatment was cursory and that he was actually aware of and deliberately indifferent to Mr. Bardo's risk of untreated skin cancer.

Because Mr. Bardo has successfully raised a genuine factual dispute as to Dr. Wright's actual knowledge of the risk of skin cancer, it will be left to a jury to decide whether Dr. Wright acted with deliberate indifference.

## III. Conclusion

Accordingly, Defendant's Motion for Summary Judgment [Doc. # 27] is DENIED.

IT IS SO ORDERED.

/s/

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 8th day of November 2019.